# Exhibit 3

***EFILED***
Case Number 2022LA000510
Date: 4/19/2022 1:10 PM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

**IN THE CIRCUIT COURT**
**FOR THE THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

| | |
|---|---|
| **JAMARCO HICKMAN,** and | ) |
| **EVAN JENSEN,** and | ) |
| **JADA WILLIAMS,** and | ) 2022LA000510 |
| **DEONTAE YANCEY** | ) |
| | ) Case No. 22-L- |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **AMAZON.COM, INC**., a corporation, and | ) |
| **AMAZON LOGISTICS, INC.**, a corporation | ) |
| **CONTEGRA CONSTRUCTION COMPANY**, | ) |
| LLC, a limited liability company, | ) |
| **TRISTAR PROPERTIES, LLC,** a limited | ) |
| liability company | ) |
| **STOCK & ASSOCIATES CONSULTING** | ) |
| **ENGINEERS, INC**., a corporation, | ) |
| **GRAY DESIGN GROUP, INC.**, | ) |
| a corporation, and | ) |
| **MCNEALY ENGINEERING, INC.**, | ) |
| a corporation. | ) |
| | ) |
| **Defendants** | ) |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW, Plaintiffs, JAMARCO HICKMAN, EVAN JENSEN, JADA WILLIAMS, and DEONTAE YANCEY, (hereinafter collectively referred as "Plaintiffs") in the above-entitled cause through their attorneys, MillerKing LLC, HILLIARD MARTINEZ GONZALES LLP, and BEN CRUMP LAW PLLC against the following Defendants, AMAZON.COM, INC. ("AMAZON.COM, INC.."), AMAZON LOGISTICS, INC. ("ALI"), CONTEGRA CONSTRUCTION COMPANY, LLC ("CONTEGRA"), TRISTAR    PROPERTIES, LLC ("TRISTAR"), STOCK & ASSOCIATES CONSULTING ENGINEERS, INC. ("STOCK"), GRAY DESIGN GROUP, INC. ("GRAY"), and MCNEALY ENGINEERING, INC.

("MCNEALY"), and shows unto this Honorable Court as follows:

## I.
## PLAINTIFFS

1.      Plaintiff, Jamarco Hickman, is an individual who resides in Godfrey, Madison County, Illinois. Plaintiff may be reached through the undersigned counsel.

2.      Plaintiff, Evan Jensen, is an individual who resides in Alton, Madison County, Illinois. Plaintiff may be reached through the undersigned counsel.

3.      Plaintiff, Jada Williams, is an individual who resides in Glen Carbon, Madison County, Illinois. Plaintiff may be reached through the undersigned counsel.

4.      Plaintiff, Deontae Yancey, is an individual who resides in Godfrey, Madison County, Illinois. Plaintiff may be reached through the undersigned counsel.

## II.
## DEFENDANTS

5.      Defendant, AMAZON.COM, INC., is a Fortune 100 company headquartered in Seattle, Washington. Defendant, AMAZON.COM, INC., and its subsidiaries ("AMAZON", "AMAZON FLEX", "AMAZON.COM, LLC", and "AMAZON LOGISTICS, INC.", comprise the world's largest retailer.

6.      In 2019 Amazon caused over 2.5 billion packages to be delivered throughout the United States, including in Illinois. It is estimated that by the end of 2022, Amazon's package delivery volume could reach 6.5 billion packages per year in the United States.

7.      Defendant, AMAZON.COM, INC.., maintains, manages, and  controls over 100 "fulfillment centers" and/or "delivery stations" in the United States. These "fulfillment centers" and/or "delivery stations" create a vast network for Defendant, AMAZON.COM, INC.., to deliver goods to customers in using these centers to store, ship, and deliver goods.

PLAINTIFFS' ORIGINAL COMPLAINT

8.      On December 10, 2021, and at all relevant times, Defendant, AMAZON.COM, INC.., maintained a warehouse or "delivery station" known as "DLI4" located in Edwardsville, Illinois. The "delivery station" known as "DLI4" was operated, maintained, controlled, and managed by employees and/or agents of Defendant, AMAZON.COM, INC..

9.      In addition, on December 10, 2021, and at all relevant times, Defendant, AMAZON.COM, INC. and AMAZON LOGISTICS, INC. utilized a wide range of independently contracted drivers and delivery carriers known as Delivery Service Partners ("DSP") to drive, haul, and make deliveries for Defendant, AMAZON.COM, INC.. and AMAZON LOGISTICS, INC.

10.     The DSP program was carefully designed to allow Amazon and ALI to shift costs and liabilities onto DSPs, while maintaining complete control over the DSPs' day-to-day operations, drivers, and potential for success. On information and belief, Amazon designed and implemented the DSP program for the primary purpose of improperly evading employment laws, labor and wage laws, transportation and logistics laws and regulations, motor vehicle negligence liability exposure, and other legal responsibility for a vast army of delivery drivers and massive van fleet.

11.     Namely, Amazon sought to interpose a layer of supposedly "independent" business entities, DSPs, between itself and its drivers to act as a legal firewall between Amazon and its employees. In reality, the DSPs themselves served as Amazon's managerial employees that hired and managed its drivers and ran its delivery operations. Through this sleight-of-hand, Amazon sought to disguise and deny its employment of tens of thousands of delivery drivers while shifting all operational liability onto hundreds of DSPs while ensuring that Amazon, and not DSPs, would capture all the value created by the DSPs and its other contractors' hard work and labor.

12.     Defendants, AMAZON.COM, INC. and AMAZON LOGISTICS, INC., will be

PLAINTIFFS' ORIGINAL COMPLAINT

collectively referred to as Defendant AMAZON.

13.     Defendant, CONTEGRA, is headquartered in Edwardsville, Illinois and maintains members that are domiciled in Illinois. Defendant, CONTEGRA, is a construction and development company that builds commercial retail buildings, warehouses, office buildings, and institutions. Defendant, CONTEGRA, built, developed, and/or constructed an Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois. Defendant, CONTEGRA, was under contract with Defendants, AMAZON.COM, INC., AMAZON LOGISTICS, INC., and/or TRISTAR, to build, develop and/or construct the subject warehouse.

14.     Defendant, TRISTAR, is headquartered in Missouri. Defendant, TRISTAR, is a developer, redeveloper, and real estate acquirer of industrial real estate. Defendant, TRISTAR, was the developer of an Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois. Defendant, TRISTAR, was under contract with Defendants, AMAZON.COM, INC.., AMAZONLOGISTICS, INC. and/or CONTEGRA, to build, develop and/or construct the subject warehouse located in Edwardsville, Illinois.

15.     Defendant, STOCK, is a civil engineering and land surveying firm based in St. Louis, Missouri. Defendant, STOCK, provided construction specifications, shop drawings, and engineering specifications for the build of the subject "delivery station" known as DLI4 in Edwardsville, Illinois, including but not limited to construction specifications, shop drawings, and engineering specifications to build the facility in a "tilt-up" manner.

16.     Defendant, GRAY, is headquartered in St. Louis, Missouri. Defendant GRAY provides specialized design services, architectural, engineering, and related services. Defendant, GRAY, joined Defendants, AMAZON.COM, INC., TRISTAR, CONTEGRA, and STOCK as the master planning, design, and architectural firm for the Amazon "fulfillment center" known as

"DLI4" and located in Edwardsville, Illinois. Defendant, GRAY, was under contract with Defendants, AMAZON.COM, INC., AMAZON LOGISTICS, INC., CONTEGRA, TRISTAR, and/or STOCK, to design, develop, and/or construct the subject warehouse located in Edwardsville, Illinois.

17.     Defendant, MCNEALY ENGINEERING, INC., is a structural engineering firm based in St. Louis, Missouri that provides architectural restoration, structural engineering, and architectural engineering services including such services for the subject "delivery station" known as DLI4 in Edwardsville, Illinois.

### III.
### JURISDICTION AND VENUE

18.     This Court has jurisdiction over all of the parties and the subject matter involved in this litigation as the amount in controversy is exceeds the Court's jurisdictional minimum requirements.

19.     Venue is proper in Madison County, Illinois because the incident giving rise to this suit occurred in this court, pursuant to 735 ILCS 5/2-101.

20.     Jurisdiction is proper in this Court over all Defendants as Defendants reside in or conduct continuous and systematic business in the State of Illinois. Plaintiff expressly disavows that any claims are being made pursuant to federal law, treaties, or constitution.

21.     Although the amount in controversy exceeds $50,000.00, exclusive of costs and interest, there is a lack of complete diversity because of the presence of a Plaintiff and one or more of Defendants that are citizens of Illinois. As such, this case is not removable to Federal Court. Any removal would be improper and should be remedied by sanctions and a remand with an award of all costs, expenses, and fees including, but not limited to, attorney fees under 28 U.S.C. § 1447(c).

## IV.
## FACTS

1.      On or about December 10, 2021, Plaintiffs arrived to work at the Amazon Warehouse located at 3036 Gateway Commerce Center Drive South, Edwardsville, Illinois 62025. Defendant Amazon is the owner, operator, and employer for the warehouse, and assumed the duty and responsibility for ensuring safe operations for its employees.

2.      On or about December 10, 2021, Plaintiffs worked for a DSP to provide delivery services out of Amazon's "DLI4" delivery station in Edwardsville, Illinois, delivering packages. Amazon required DeAndre Morrow to complete training provided by Amazon.

3.      Under the DSP program, Amazon closely monitored and controlled all material aspects of DeAndre Morrow's work and the work of his co-employees.

4.      The nature of the work performed by drivers was similar and standardized at each Amazon delivery station and was centrally controlled and directed by Amazon.

5.      Amazon controlled the drivers' day-to-day activities through direct contact with them.

6.      Amazon set the delivery routes and then assigned and provided them to its DSPs. Every week, Amazon sent the DSPs, the number, type, and start time for the delivery routes for the upcoming week.

7.      DSP drivers were each assigned a cell phone loaded with proprietary Amazon delivery software ("Amazon Flex") and drove an Amazon-branded vehicle to the Amazon delivery station, where Amazon employees pre-sorted packages for delivery. Drivers then logged into Amazon Flex to access their Amazon assigned route and picked up the assigned packages. The packages were not transformed or modified during the shipping process but were delivered in the same condition as they were shipped to the Amazon delivery station.

8.      Amazon, through its Cortex system, tracked and monitored the DSP drivers' job performance in real time, tracking delivery rate, delivery speed, delivery accuracy, driver distractions, seatbelt use, driving speed and acceleration, and adherence to a delivery schedule created by Amazon through Amazon Flex and its EMentor application. Every day, Amazon sent an email documenting each delivery driver's job performance to the DSPs.

9.      Amazon required DSP drivers to explain why any package was returned to the station at the end of a driver's shift. Amazon routinely threatened drivers with suspension or termination if they did not go back out to attempt redelivery of 100% of dispatched packages, even if the driver had been on the road more than ten hours.

10.      Amazon set the start time and end time for drivers and dictated the hours of delivery in which a delivery driver could deliver a package, including the start time and end time for each route. For example, Amazon employees sent delivery drivers text messages when they approached ten hours.

11.      Amazon employees also direct DSP employees to cease delivering or to continue delivering. On more than one occasion, DSP drivers were called back to the delivery station and told not to deliver packages well before the drivers' shifts had ended.

12.      Tragically, due to Defendant Amazon's blatant disregard for its employees' and contractors' safety and well-being and motivated by profit and productivity at the expense of its workers' health, at least six (6) people lost their lives. This horrible tragedy was preventable, had basic and necessary care and concern for Defendant Amazon's workers been applied by Defendant Amazon, as it were legally obligated to do.

13.      Defendant Amazon was warned by the National Weather Service of possible tornadoes in the area of the warehouse as far as thirty-six (36) hours ahead of this tragic incident.

PLAINTIFFS' ORIGINAL COMPLAINT

Upon receipt of these warnings, Defendant Amazon allegedly did not modify the employee or contractor work schedule and refused to permit employees from taking time off until the storm passed. On or about December 10, 2021, Defendant Amazon received additional tornado warnings between 8:06 p.m. and 8:16 p.m. Defendant Amazon inadequately responded by warning only a portion of the employees and instructing them to retreat into the warehouse restrooms for safety. The tornado hit at roughly 8:26 p.m. that evening with 150 m.p.h. winds which ripped off the roof of the warehouse and caused 11-inch-thick concrete walls to fall in on themselves.

14.     Unfortunately, this incident is only the latest in a pattern of disregarding employee safety and ignoring warnings of oncoming natural disasters. On or about September 2021, similar warehouses ran by Defendant Amazon ignored similar warnings by the National Weather Service of the oncoming tropical depression "Ida" which led to the deaths of fourteen (14) employees. Previously, on or about November 8, 2018, Defendant Amazon ignored warnings as a result of a wildfire in California putting their employees at risk in the name of productivity and profits. In November of 2018, Defendant Amazon had another warehouse that was struck by a tornado in Baltimore, Maryland, that caused the warehouse to collapse and two (2) men to die as a result. When warned of widespread record-breaking high heatwaves over the summer of 2021, Defendant Amazon refused to take adequate measures which led to the widespread employee health issues and the death of an employee within a similar warehouse in Bessemer, Alabama.

15.     Plaintiff Evan Jensen was employed by XSeed, Inc., an Amazon DSP contractor, for approximately six months prior to the tornado. Plaintiff was provided an Amazon truck equipped with a 4-way camera and an Amazon uniform. On December 10, 2021, Mr. Jensen's shift was scheduled between 9:00 a.m. and 8:30 p.m.

16.     At approximately 7:00 pm, Mr. Jensen sent a text message to his manager

requesting to return to the warehouse. Following such approval, Mr. Jensen arrived at DLI4 at approximately 8:00 p.m.  Mr. Jensen attempted to leave the warehouse to return home before the storm hit but was threatened with termination by a warehouse official if he left the warehouse. The storm hit around 8:30 p.m.

17.     Fearful of termination, Mr. Jenson remained in the warehouse and was directed to take shelter in the warehouse break room at the time of the storm.  Upon information and belief, Plaintiff believes that he would have made it to his personal residence if he would have been allowed to leave the warehouse.

18.     Plaintiff Jada Williams was employed by XSeed, Inc., an Amazon DSP contractor, for approximately two weeks prior to the tornado. Plaintiff was provided an Amazon truck equipped with a 4-way camera and an Amazon uniform. On December 10, 2021, Ms. Williams' shift was scheduled between 9:00 a.m. and 8:30 p.m.

19.     Ms. Williams was directed to take shelter in a bathroom on the north end of the warehouse at the time of the storm.  Ms. Williams attempted to leave the warehouse to return home before the storm hit but was threatened with termination by a warehouse official if she left the warehouse.

20.     Plaintiff Deontae Yancey was employed by XSeed, Inc., an Amazon DSP contractor, for approximately three months prior to the tornado. Plaintiff was provided an Amazon truck equipped with a 4-way camera and an Amazon uniform. On December 10, 2021, Ms. Williams' shift was scheduled between 10:00 a.m. and 9:00 p.m.

21.     Defendant Amazon would require its drivers to "rescue" fellow drivers when other drivers had not completed their deliveries.  To "rescue" another driver means to go out and help them finish delivering their packages.

22.    National Weather Service alerts covering St Louis County and Madison County, including Edwardsville were issued via Twitter at 6:17 pm.





23.    At 6:32 p.m., Mr. Yancey received a message from Nikita Sunil via the Amazon Flex App requesting that he rescue a fellow driver.  Fearful of the approaching storm, Mr. Yancey refused.

PLAINTIFFS' ORIGINAL COMPLAINT



24.     Mr. Yancey was directed to take shelter in a bathroom on the north end of the warehouse at the time of the storm.  Mr. Yancey attempted to leave the warehouse to return home before the storm, however, he was told to "stay put and not to leave" by warehouse officials.

25.     Plaintiff Jamarco Hickman was employed by ABC & DAD, Inc., an Amazon DSP contractor, for approximately four months prior to the tornado. Plaintiff was provided an Amazon truck equipped with a 4-way camera and an Amazon uniform. On December 10, 2021, Mr. Hickman's shift was scheduled between 9:30 a.m. and 8:30 p.m.

26.     On Thursday, December 9, 2021, a team huddle was conducted warehouse staging area inside of the delivery garage wherein the dispatch manager announced that Amazon wanted more drivers on the road because of the holiday peak season so drivers were expected to begin normally scheduled shifts one hour earlier than their scheduled shift.  During this meeting, the dispatcher manager also announced a peak season incentive program, wherein drivers could earn a $20 Amazon gift card for delivering 200 additional packages per day.

PLAINTIFFS' ORIGINAL COMPLAINT

27.     On December 10, 2021, at approximately 7:40 pm, Mr. Hickman finished a rescue of a fellow driver.  He called dispatch and requested to return to the warehouse because the sky was becoming increasingly dark.

28.     Mr. Hickman returned to the DLI4 warehouse at approximately 8:15 p.m.  He was immediately instructed to park his delivery van and go to the restrooms for shelter where he remained until emergency medical services arrived following the storm.

29.     Defendant Amazon controlled, directed, and/or instructed Plaintiffs, which included controlling, directing, and/or instructing Plaintiffs, on the operative details of their work, including but not limited to, controlling the deliveries and the routes Plaintiffs followed, requiring Plaintiffs to wear a uniform and/or apparel that displayed the name "Amazon" on it. Defendant Amazon provided DSP drivers with a $120 store credit to Zappos.com to purchase work shoes.

30.     Plaintiffs were also required to follow the policies and procedures of Defendant Amazon, controlling the number of deliveries Plaintiffs made during a shift, monitoring and scoring work performance, requiring Plaintiffs to share phone data, and having the means to terminate the employment of Plaintiffs.

31.     At approximately 8:20 p.m., an EF-3 tornado began on the south side of Interstate 270 and moved northeast, striking the subject Amazon fulfillment center known as DLI4, causing parts of the center's walls to collapse and other multiple structure failures which resulted in numerous injuries and the death of six individuals.

32.     On and before December 10, 2021, Defendant Amazon employed an individual and/or individuals at the subject Amazon fulfillment center that were responsible for monitoring severe weather updates.

33.     On December 10, 2021, Defendant Amazon, knew or should have known that

PLAINTIFFS' ORIGINAL COMPLAINT

tornadoes were possible at or near the subject "fulfillment center" as early as 3:44 a.m. on Thursday, December 9, 2021, when the National Weather Service issued the following weather warning: "*There is chance of thunderstorms late Friday afternoon into the night across southeastern and east-central Missouri as well as south-central and southwestern Illinois. A few thunderstorms could become strong to severe in southeastern Missouri and southwestern Illinois late Friday evening into night. The main threat will be strong to damage wind gusts, but a tornado is also possible.*"

34.     On December 10, 2021, Defendant Amazon, again knew or should have known that tornadoes were possible at or near the subject "fulfillment center" when the National Weather Service on December 9, 2021 at 2:58 p.m. reported: "*Scattered severe storms are possible across southeast Missouri and southwest Illinois between 8:00 p.m. Friday night and 3:00 a.m. early Saturday. Any storms that develop will be fast moving. The primary threat with these storms will be damaging winds. A few tornadoes will be possible as well.*"

35.     On December 10, 2021 at 8:06 p.m., the National Weather Service issued a "take shelter now" tornado warning for the Edwardsville, Illinois area.

36.     Despite having numerous warnings from the National Weather Service that the Edwardsville, Illinois area was at risk of experiencing devastating weather and/or tornadoes, Defendant Amazon had workers and independently contracted Delivery Service Partners ("DSP") working during a holiday "peak season" until moments before the EF-3's tornado obliterated the subject fulfillment center in Edwardsville, Illinois.

37.     At all times on December 10, 2021, Defendant Amazon, knew or should have known and foreseen that the subject fulfillment center was in an area that could sustain devastating weather and/or a tornado.

PLAINTIFFS' ORIGINAL COMPLAINT

38.     On December 10, 2021 and at all relevant times, Defendant Amazon, had duties to exercise reasonable care in its operation, management, and/or control of the subject fulfillment center and all workers present at the center, including but not limited to, independently contracted DSP contractors including Plaintiffs, to prevent them from sustaining injuries and death.

39.     Plaintiff attaches as "Exhibit A" to this Complaint the West County EMS & Fire Protection District's Report authored by Dan Bruno, P.E., PTOE, to further support her causes of action against Defendants.

40.     As stated by Mr. Bruno, "…I found what I believed to be one or more significant structural issues with the Amazon building that may have contributed to the failure of the structure."  *See* Exhibit A at 4. Shockingly, Mr. Bruno discovered why these columns failed and caused the death of these six (6) individuals:

> "In each case of the failed columns, there was a clear line of demarcation on the bottom of the column just below the yellow band that showed an area of unpainted column with light brown surface oxidation that had been the area of the column that sat below the finished grade of the concrete floor. I became concerned when I noticed that none of the columns appeared to be ripped or torn from the base. This was especially concerning to me knowing that the International Building Code (IBC) requires structural members to be secured against uplift from wind loads, among other things. (2021 IBC Section 1604.8.1). Looking at the base of the columns more closely, I could find no weld or bolted connection at the base of any column, but only a bead of what appeared to be some sort of caulk around the column at the finished floor line. An examination of several of the empty pockets where [sic] columns once stood also did not reveal any indication of positive securement of the column et at or below the finished floor level."

*See* Exhibit A at 2.

41.     As a result of Defendants' negligence and continuous blatant disregard for the health and safety of their workers, Plaintiffs suffered life-altering injuries and damages.

PLAINTIFFS' ORIGINAL COMPLAINT

## COUNTS

## COUNT 1: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (NIED):

## AMAZON DEFENDANTS

8.      Plaintiffs incorporate and re-allege each of the paragraphs as set for above as though fully set forth herein.

9.      Plaintiffs suffered physically and psychologically from direct impact of Defendants' negligence.

10.     At all times mentioned herein, Defendant Amazon owed duties to Plaintiffs, including but not limited to the follow and, by various acts and omissions, breached these duties, each of which singularly or in combination, was approximate cause of the occurrence in question and Plaintiffs' injuries and damages:

   a.      Failing to warn about or abate known safety risks and hazards;

   b.      Failing to provide proper, safe equipment, and competent personnel;

   c.      Failing to design an adequate safety plan and provide adequate personnel to execute the safety plan;

   d.      Failing to have a basement shelter or actual shelter;

   e.      Failing to implement proper safety procedures in the event of an evacuation or natural disaster;

   f.      Failing to follow safety procedures while the natural disaster was unfolding;

   g.      Failing to properly monitor inclement weather prior to the tornado hitting the fulfillment center;

   h.      Failing to operate, maintain, and manage a warehouse in an area prone to tornadoes that was built to withstand tornado size gusts;

   i.      Failing to ensure that Mr. Morrow was in the safest place in the fulfillment center when the tornado touched ground;

   j.      Failing to have a proper Emergency Action Plan meeting the requirements of

OSHA 29 CFR 1910.38;

k.   Failing to train employees and contractors how to follow an Emergency Action Plan;

l.   Failing to review an Emergency Action Plan with each individual per OSHA 1910.38(e);

m.   Failing to have a proper alarm/warning in place at the subject fulfillment center per OSHA 1910.38(d) and 1910.165 to warn of the approaching tornado;

n.   Requiring Mr. Morrow to continue working until the moments before the tornado struck when Amazon knew or should have known the tornado was imminent;

o.   Failing to hold safety meetings with individuals, including decedent, DeAndre Morrow, in advance of December 10, 2021, to prepare individuals on the safest course of action to take if a tornado is imminent;

p.   Failing to timely inform individuals at the subject fulfillment center that a tornado was approaching so those individuals had adequate time to properly shelter or evacuate;

q.   Failing to evacuate all those present at the subject delivery station when Amazon knew or should have known that keeping individuals working at the center, including decedent, DeAndre Morrow, placed them in imminent danger when Amazon knew or should have known the area was at-risk of a tornado;

r.   Failing to operate, maintain and manage a warehouse in an area prone to tornadoes that was equipped with a "safe room" consistent with FEMA P-321 and FEMA P-361;

s.   Failing to operate, maintain and manage a warehouse in an area prone to tornadoes that was equipped with a "best available refugee area" consistent with FEMA P-431;

t.   Failing to operate, maintain and manage a warehouse in an area prone to tornadoes that was built to withstand tornado size gusts;

u.   Failing to have a qualified architect or engineer designate the "bast available refugee area" per FEMA P-431;

v.   Failing to provide a warehouse that was built in compliance with International Building Code Section 1604; and

w.   Was otherwise carless and negligent.

11.     Such acts would cause distress in any reasonable person and in fact were the direct, proximate, and foreseeable cause of the mental anguish and severe emotional distress in Plaintiffs.

12.     The acts and omission of the Defendant Amazon as described above constitutes negligence, and Defendant Amazon's breaches of its legal duty proximately caused injury and damages to Plaintiffs. Defendant Amazon breached its duty, failed to exercise reasonable care and such failure proximately caused the occurrence in question.

13.     Defendant Amazon is liable under the doctrine of *respondeat superior* for the individuals responsible for ensuring employee safety as they were acting in the capacity as an agent, servant, and/or employee of Defendant Amazon, and were acting within the course and scope of its authority as such. There, the doctrine of Respondent Superior should be applied to Defendant Amazon as follows:

     a.    negligent hiring;
     b.    negligent entrustment;
     c.    negligent training and safety implementation; and
     d.    negligent retention.

14.     Defendant Amazon acted willfully, recklessly, with conscious disregard for or with deliberate indifference towards, Plaintiffs' well-being and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendant Amazon and as will serve as an example to prevent repetition of such conduct in the future.

15.     As a direct and proximate cause of one or more of the aforementioned careless negligent acts and/or omissions of Defendant Amazon, the Plaintiffs suffered devastating physical and emotional injuries that they will suffer from for the rest of their lives.

16.     As a direct and proximate result of Defendant Amazon's intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss

of past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants AMAZON.COM, INC. and AMAZON LOGISTICS, INC. in an amount in excess of Fifty-Thousand Dollars ($50,000.00).

## COUNT II: NEID: CONTEGRA CONSTRUCTION COMPANY, LLC

1.      Plaintiff re-alleges Paragraphs 1-28 of Section IV for Paragraph 1 of Count II.

2.      On and before December 10, 2021, Defendant Contegra was a construction and development company that built commercial retail buildings, warehouses, office buildings, and institutions.

3.      Prior to December 10, 2021, Defendant Contegra built, developed, and/or constructed an Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois. Defendant Contegra was under contract with Defendants, Amazon.com, Inc., Amazon Logistics, Inc., and/or Tristar, to build, develop and/or construct the subject warehouse.

4.      Prior to December 10, 2021 and during all phases of the construction of the subject warehouse, Defendant, Contegra, individually and through its agents, servants, and/or employees was present during the course of such construction and Defendant, Contegra, participated, orchestrated, managed, supervised, controlled, directed, and/or was in charge of the work being done at the aforesaid project including but not limited to directing the means, methods and operative

details of the work being done by on-site workers, including but not limited to workers of Defendant, Tristar. The Defendant, Contegra, individually and through its agents, servants, and/or employees participated in coordinating the work being done and designated various work methods, had a responsibility to maintain a safe premise for all workers, maintained and checked work progress, and participated in the scheduling of the work and inspection of the work.

5.     That at all relevant times, Defendant Contegra had a duty to exercise reasonable care in its build, planning, and construction of the subject "delivery station" located in Edwardsville, Illinois.

6.     Notwithstanding its duties, at said time and place, Defendant Contegra by and through its agents, servants, and employees, was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

a.     Built and/or constructed the subject "delivery station" without a basement or actual shelter that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

b.     Built and/or constructed the subject "delivery station" without a "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

c.     Failed to recommend that the subject "delivery station" be built with a basement shelter, shelter or "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and/or tornadoes;

d.     Built and/or constructed the subject "delivery station" in a "tilt-up" wall construction manner when Defendant knew or should have known that this manner of construction causes walls to fall when struck with high winds and knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

e.     Failed to adequately build the subject "delivery station" in a manner to prevent walls from collapsing and the roof from separating when struck with high winds when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

     f.     Failed to build the subject "delivery station" pursuant to all local, state, and federal codes that prevented structural collapse due to inclement weather;

     g.     Failed to provide a warehouse that was built in compliance with International Building Code Section 1604;

     h.     Was otherwise careless and negligent.

7.     Such acts would cause distress in any reasonable person and in fact were the direct, proximate, and foreseeable cause of the mental anguish and severe emotional distress in Plaintiffs.

8.     Defendant Contegra is liable under the doctrine of *respondeat superior* for the individuals responsible for ensuring employee safety as they were acting in the capacity as an agent, servant, and/or employee of Defendant Contegra, and were acting within the course and scope of its authority as such. There, the doctrine of Respondent Superior should be applied to Defendant Contegra as follows:

     a.     negligent hiring;
     b.     negligent entrustment;
     c.     negligent training and safety implementation; and
     d.     negligent retention.

9.     Defendant Contegra acted willfully, recklessly, with conscious disregard for or with deliberate indifference towards, Plaintiffs' well-being and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendant Contegra and as will serve as an example to prevent repetition of such conduct in the future.

10.     As a direct and proximate cause of one or more of the aforementioned careless negligent acts and/or omissions of Defendant Contegra, the Plaintiffs suffered devastating physical and emotional injuries that they will suffer from for the rest of their lives.

11.     As a direct and proximate result of Defendant Contegra's intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss

PLAINTIFFS' ORIGINAL COMPLAINT

of past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant, Contegra Construction Company, LLC, in an amount in excess of Fifty-Thousand Dollars($50,000.00).

## COUNT III: NEID: TRISTAR PROPERTIES, LLC

1.      Plaintiffs re-allege Paragraphs 1-28 of Section IV for Paragraph 1 of Count III.

2.      On and before December 10, 2021, Defendant Tristar was a construction and development company that builds commercial retail buildings, warehouses, office buildings, and institutions.

3.      Prior to December 10, 2021, Defendant Tristar built, developed, and/or constructed an Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois.

4.      Defendant Tristar was under contract with Defendants, Amazon.com, Inc., Amazon Logistics, and/or Contegra, to build, develop, and/or construct the subject warehouse.

5.      Prior to December 10, 2021 and during all phases of the construction of the subject warehouse, Defendant Tristar individually and through its agents, servants, and/or employees was present during the course of such construction and Defendant Tristar participated, orchestrated, managed, supervised, controlled, directed, and/or was in charge of the work being done at the aforesaid project including but not limited to directing the means, methods and operative details

PLAINTIFFS' ORIGINAL COMPLAINT

of the work being done by on-site workers, including but not limited to workers of Defendant, Tristar. Defendant Tristar individually and through its agents, servants, and/or employees participated in coordinating the work being done and designated various work methods, had a responsibility to maintain a safe premise for all workers, maintained and checked work progress, and participated in the scheduling of the work and inspection of the work.

6.     That at all relevant times, Defendant Tristar had a duty to exercise reasonable care in its build, planning, and construction of the subject "delivery station" located in Edwardsville, Illinois.

7.     Notwithstanding its duties, at said time and place, Defendant Tristar by and through its agents, servants, and employees, was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

a.     Built and/or constructed the subject "delivery station" without a basement or actual shelter that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

b.     Built and/or constructed the subject "delivery station" without a "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

c.     Failed to recommend that the subject "delivery station" be built with a basement shelter, shelter or "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and/or tornadoes;

d.     Built and/or constructed the subject "delivery station" in a "tilt-up" wall construction manner when Defendant knew or should have known that this manner of construction causes walls to fall when struck with high winds and knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

e.     Failed to adequately build the subject "delivery station" in a manner to prevent walls from collapsing and the roof from separating when struck withhigh winds when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

PLAINTIFFS' ORIGINAL COMPLAINT

f.      Failed to build the subject "delivery station" pursuant to all local, state,and federal codes that prevented structural collapse due to inclement weather;

g.      Failed to provide a warehouse that was built in compliance with International Building Code Section 1604; and

h.      Was otherwise careless and negligent.

8.      Such acts would cause distress in any reasonable person and in fact were the direct, proximate, and foreseeable cause of the mental anguish and severe emotional distress in Plaintiffs.

9.      Defendant Tristar is liable under the doctrine of *respondeat superior* for the individuals responsible for ensuring employee safety as they were acting in the capacity as an agent, servant, and/or employee of Defendant Tristar, and were acting within the course and scope of its authority as such. There, the doctrine of Respondent Superior should be applied to Defendant Tristar as follows:

a.      negligent hiring;
b.      negligent entrustment;
c.      negligent training and safety implementation; and
d.      negligent retention.

10.      Defendant Tristar acted willfully, recklessly, with conscious disregard for or with deliberate indifference towards, Plaintiffs' well-being and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendant Tristar and as will serve as an example to prevent repetition of such conduct in the future.

11.      As a direct and proximate cause of one or more of the aforementioned careless negligent acts and/or omissions of Defendant Tristar, the Plaintiffs suffered devastating physical and emotional injuries that they will suffer from for the rest of their lives.

12.      As a direct and proximate result of Defendant Tristar's intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss of

PLAINTIFFS' ORIGINAL COMPLAINT

past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant, Tristar Properties, LLC, in an amount in excess of Fifty-Thousand Dollars ($50,000.00).

## COUNT IV: NEID: STOCK & ASSOCIATES CONSULTING ENGINEERS, INC.

1.      Plaintiffs re-allege Paragraphs 1-28 of Section IV for Paragraph 1 of Count IV.

2.      On and before December 10, 2021, Defendant Stock was a construction and development company that builds commercial retail buildings, warehouses, office buildings, and institutions.

3.      Prior to December 10, 2021, Defendant Stock built, developed, and/or constructed an Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois.

4.      Defendant Stock was under contract with Defendants, Amazon.com, Inc., Amazon Logistics, and/or Contegra, to build, develop, and/or construct the subject warehouse.

5.      Prior to December 10, 2021 and during all phases of the construction of the subject warehouse, Defendant Stock individually and through its agents, servants, and/or employees was present during the course of such construction and Defendant Stock participated, orchestrated, managed, supervised, controlled, directed, and/or was in charge of the work being done at the aforesaid project including but not limited to directing the means, methods and operative details

PLAINTIFFS' ORIGINAL COMPLAINT

of the work being done by on-site workers, including but not limited to workers of Defendant, Stock. Defendant Stock individually and through its agents, servants, and/or employees participated in coordinating the work being done and designated various work methods, had a responsibility to maintain a safe premise for all workers, maintained and checked work progress, and participated in the scheduling of the work and inspection of the work.

6.      That at all relevant times, Defendant Stock had a duty to exercise reasonable care in its build, planning, and construction of the subject "delivery station" located in Edwardsville, Illinois.

7.      Notwithstanding its duties, at said time and place, Defendant Stock by and through its agents, servants, and employees, was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

   a.      Built and/or constructed the subject "delivery station" without a basement or actual shelter that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

   b.      Built and/or constructed the subject "delivery station" without a "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

   c.      Failed to recommend that the subject "delivery station" be built with a basement shelter, shelter or "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and/or tornadoes;

   d.      Built and/or constructed the subject "delivery station" in a "tilt-up" wall construction manner when Defendant knew or should have known that this manner of construction causes walls to fall when struck with high winds and knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

   e.      Failed to adequately build the subject "delivery station" in a manner to prevent walls from collapsing and the roof from separating when struck with high winds when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

      f.     Failed to build the subject "delivery station" pursuant to all local, state,and federal codes that prevented structural collapse due to inclement weather;

      g.     Failed to provide a warehouse that was built in compliance with International Building Code Section 1604; and

      h.     Was otherwise careless and negligent.

8.     Such acts would cause distress in any reasonable person and in fact were the direct, proximate, and foreseeable cause of the mental anguish and severe emotional distress in Plaintiffs.

9.     Defendant Stock is liable under the doctrine of *respondeat superior* for the individuals responsible for ensuring employee safety as they were acting in the capacity as an agent, servant, and/or employee of Defendant Stock, and were acting within the course and scope of its authority as such. There, the doctrine of Respondent Superior should be applied to Defendant Stock as follows:

      a.     negligent hiring;
      b.     negligent entrustment;
      c.     negligent training and safety implementation; and
      d.     negligent retention.

10.     Defendant Stock acted willfully, recklessly, with conscious disregard for or with deliberate indifference towards, Plaintiffs' well-being and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendant Stock and as will serve as an example to prevent repetition of such conduct in the future.

11.     As a direct and proximate cause of one or more of the aforementioned careless negligent acts and/or omissions of Defendant Stock, the Plaintiffs suffered devastating physical and emotional injuries that they will suffer from for the rest of their lives.

12.     As a direct and proximate result of Defendant Stock's intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss of

past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant, Stock & Associates Consulting Engineers, Inc., in an amount in excess of Fifty-Thousand Dollars ($50,000.00).

## COUNT V: NEID: GRAY DESIGN GROUP, INC.

1.      Plaintiffs re-allege Paragraphs 1-28 of Section IV for Paragraph 1 of Count V.

2.      On and before December 10, 2021, Defendant Gray was a construction and development company that builds commercial retail buildings, warehouses, office buildings, and institutions.

3.      Prior to December 10, 2021, Defendant Gray built, developed, and/or constructed an Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois.

4.      Defendant Gray was under contract with Defendants, Amazon.com, Inc., Amazon Logistics, and/or Contegra, to build, develop, and/or construct the subject warehouse.

5.      Prior to December 10, 2021 and during all phases of the construction of the subject warehouse, Defendant Gray individually and through its agents, servants, and/or employees was present during the course of such construction and Defendant Gray participated, orchestrated, managed, supervised, controlled, directed, and/or was in charge of the work being done at the aforesaid project including but not limited to directing the means, methods and operative details

of the work being done by on-site workers, including but not limited to workers of Defendant, Gray. Defendant Gray individually and through its agents, servants, and/or employees participated in coordinating the work being done and designated various work methods, had a responsibility to maintain a safe premise for all workers, maintained and checked work progress, and participated in the scheduling of the work and inspection of the work.

6.      That at all relevant times, Defendant Gray had a duty to exercise reasonable care in its build, planning, and construction of the subject "delivery station" located in Edwardsville, Illinois.

7.      Notwithstanding its duties, at said time and place, Defendant Gray by and through its agents, servants, and employees, was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

a.      Built and/or constructed the subject "delivery station" without a basement or actual shelter that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

b.      Built and/or constructed the subject "delivery station" without a "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

c.      Failed to recommend that the subject "delivery station" be built with a basement shelter, shelter or "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and/or tornadoes;

d.      Built and/or constructed the subject "delivery station" in a "tilt-up" wall construction manner when Defendant knew or should have known that this manner of construction causes walls to fall when struck with high winds and knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

e.      Failed to adequately build the subject "delivery station" in a manner to prevent walls from collapsing and the roof from separating when struck with high winds when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

PLAINTIFFS' ORIGINAL COMPLAINT

    f.     Failed to build the subject "delivery station" pursuant to all local, state,and federal codes that prevented structural collapse due to inclement weather;

    g.     Failed to provide a warehouse that was built in compliance with International Building Code Section 1604; and

    h.     Was otherwise careless and negligent.

8.     Such acts would cause distress in any reasonable person and in fact were the direct, proximate, and foreseeable cause of the mental anguish and severe emotional distress in Plaintiffs.

9.     Defendant Gray is liable under the doctrine of *respondeat superior* for the individuals responsible for ensuring employee safety as they were acting in the capacity as an agent, servant, and/or employee of Defendant Gray, and were acting within the course and scope of its authority as such. There, the doctrine of Respondent Superior should be applied to Defendant Gray as follows:

    a.     negligent hiring;
    b.     negligent entrustment;
    c.     negligent training and safety implementation; and
    d.     negligent retention.

10.     Defendant Gray acted willfully, recklessly, with conscious disregard for or with deliberate indifference towards, Plaintiffs' well-being and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendant Gray and as will serve as an example to prevent repetition of such conduct in the future.

11.     As a direct and proximate cause of one or more of the aforementioned careless negligent acts and/or omissions of Defendant Gray, the Plaintiffs suffered devastating physical and emotional injuries that they will suffer from for the rest of their lives.

12.     As a direct and proximate result of Defendant Gray's intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss of

past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant, Gray Design Group, Inc., in an amount in excess of Fifty-Thousand Dollars ($50,000.00).

## COUNT VI: NEID: MCNEALY ENGINEERING, INC.

1.      Plaintiffs re-allege Paragraphs 1-28 of Section IV for Paragraph 1 of Count VI.

2.      On and before December 10, 2021, Defendant McNealy was a structural engineering firm based in St. Louis, Missouri that provides architectural restoration, structural engineering, and architectural engineering services including such services for the subject "delivery station" known as DLI4 in Edwardsville, Illinois.

3.      Prior to December 10, 2021, Defendant McNealy built, developed, provided architectural services, structural engineering services, and/or constructed the Amazon "delivery station" known as "DLI4" located in Edwardsville, Illinois. Defendant McNealy was under contract with Defendants, Amazon.com, Inc., Amazon Logistics, Tristar, Stock, Gray and/or Contegra, to assist in the build, develop and/or construct the subject warehouse.

4.      Defendant McNealy was under contract with Defendants, Amazon.com, Inc., Amazon Logistics, Tristar, Stock, Gray and/or Contegra, to assist in the build, develop and/or construct the subject warehouse.

PLAINTIFFS' ORIGINAL COMPLAINT

5.      Prior to December 10, 2021 and during all phases of the construction of the subject warehouse, Defendant McNealy individually and through its agents, servants, and/or employees was present during the course of such construction and Defendant McNealy participated, orchestrated, managed, supervised, controlled, directed, and/or was in charge of the work being done at the aforesaid project including but not limited to directing the means, methods and operative details of the work being done by on-site workers, including but not limited to workers of Defendant, Gray. Defendant McNealy individually and through its agents, servants, and/or employees participated in coordinating the work being done and designated various work methods, had a responsibility to maintain a safe premise for all workers, maintained and checked work progress, and participated in the scheduling of the work and inspection of the work.

6.      That at all relevant times, Defendant McNealy had a duty to exercise reasonable care in its build, planning, and construction of the subject "delivery station" located in Edwardsville, Illinois.

7.      Notwithstanding its duties, at said time and place, Defendant McNealy by and through its agents, servants, and employees, was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

  a.      Built and/or constructed the subject "delivery station" without a basement or actual shelter that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

  b.      Built and/or constructed the subject "delivery station" without a "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement weather including but not limited to tornadoes;

  c.      Failed to recommend that the subject "delivery station" be built with a basement shelter, shelter or "safe room" that could provide shelter when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and/or tornadoes;

PLAINTIFFS' ORIGINAL COMPLAINT

    d.    Built and/or constructed the subject "delivery station" in a "tilt-up" wall construction manner when Defendant knew or should have known that this manner of construction causes walls to fall when struck with high winds and knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

    e.    Failed to adequately build the subject "delivery station" in a manner to prevent walls from collapsing and the roof from separating when struck with high winds when Defendant knew that Edwardsville, Illinois was prone to inclement, severe weather and tornadoes;

    f.    Failed to build the subject "delivery station" pursuant to all local, state, and federal codes that prevented structural collapse due to inclement weather;

    g.    Failed to provide a warehouse that was built in compliance with International Building Code Section 1604; and

    h.    Was otherwise careless and negligent.

8.    Such acts would cause distress in any reasonable person and in fact were the direct, proximate, and foreseeable cause of the mental anguish and severe emotional distress in Plaintiffs.

9.    Defendant McNealy is liable under the doctrine of *respondeat superior* for the individuals responsible for ensuring employee safety as they were acting in the capacity as an agent, servant, and/or employee of Defendant McNealy, and were acting within the course and scope of its authority as such. There, the doctrine of Respondent Superior should be applied to Defendant McNealy as follows:

    a.    negligent hiring;
    b.    negligent entrustment;
    c.    negligent training and safety implementation; and
    d.    negligent retention.

10.    Defendant McNealy acted willfully, recklessly, with conscious disregard for or with deliberate indifference towards, Plaintiffs' well-being and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendant McNealy and as will serve as an example to prevent repetition of such conduct in the future.

11.     As a direct and proximate cause of one or more of the aforementioned careless negligent acts and/or omissions of Defendant McNealy, the Plaintiffs suffered devastating physical and emotional injuries that they will suffer from for the rest of their lives.

12.     As a direct and proximate result of Defendant McNealy's intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss of past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant, McNealy Engineering, Inc., in an amount in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED): ALL DEFENDANTS

1.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if stated verbatim in Paragraph 1 of Count VII.

2.     The intentional and reckless acts, omissions and inactions of Defendants, Amazon, Contegra, Stock, Gray, and McNealy, were extreme and outrageous and severely interfered with Plaintiffs' health, creating a dangerous and deadly environment which led to Plaintiffs need for psychological help.

3.     These intentional and reckless acts, omissions, and inactions by Defendants were

extreme and outrageous and of such a nature as to provoke severe emotional disturbance in a reasonable person and in fact, were the direct, proximate, and foreseeable cause of mental anguish and severe emotional distress in Plaintiffs.

4.      As a direct and proximate result of Defendants' intentional and reckless acts, omissions and inactions, Plaintiffs suffered economic harm, including but not limited to: loss of past and future pay and benefits; loss of career opportunities; loss of future earnings and other incidentals, loss of benefits of employment, and severe emotional distress, including but not limited to: loss of self-esteem; difficulty in forming other relationships; mental anguish; emotional trauma; physical harm; grief; shame; embarrassment; anger; overwhelming sense of injustice; paranoia, fear, disappointment; insomnia; anxiety; nervousness; worry; and depression. Plaintiffs has suffered a loss of enjoyment of a normal life because of their physical and emotional injuries and has lost their ability to engage in the same kinds of normal activities, all to their damages.

5.      Defendants acted with malice toward Plaintiffs and Plaintiffs are entitled to recover punitive damages in such amount as will sufficiently punish Defendants for their willful and malicious conduct and as well serve as an example to prevent repetition of such conduct in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendants, Amazon.com, Inc., Amazon Logistics, Inc., Contegra Construction Company, LLC, Tristar Properties, LLC, Stock & Associates Consulting Engineers, Inc., Gray Design Group, Inc., and McNealy Engineering, Inc., in an amount in excess of Fifty-Thousand Dollars ($50,000.00).

## V.
## DAMAGES

1.      By reason of all of the above, Plaintiffs have suffered losses and damages in a sum within the jurisdictional limits of this court, and for which she now sues. Each of the Defendants'

acts and/or omissions, whether taken singularly or in any combination constitutes negligence and negligence *per se* which proximately caused the incident and injuries and other losses as specifically set forth herein, all of which Plaintiffs suffered and which Plaintiff will continue to suffer in the future, if not for the remainder of their natural lives.

2.      By reason of all of the above, Plaintiffs have suffered losses and damages in a sum within the jurisdictional limits of this Court for which they now sue.

      a.      An amount reasonably calculated to compensate Plaintiffs for the physical harm inflicted upon them by Defendants;

      b.      An amount reasonably calculated to compensate Plaintiffs for their emotional distress and loss of enjoyment of life;

      c.      General compensatory damages according to proof;

      d.      Interest on such damages awarded at the legal rate from the date of commencement of interest accrual until paid;

      e.      Costs of suit; and

      f.      Such other and further relief as the Court deems just and proper.

3.      Plaintiffs reserve the right to amend this pleading as discovery progresses in this case.

## VI.
## JURY DEMAND

1.      Plaintiffs request a trial by jury (12) on all issues.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants be cited to appear and answer, and that on final trial Plaintiffs have: (1) judgment against Defendants for actual and compensatory damages in accordance with the evidence and the law; (2) pre-judgment and post-judgment interest as provided by law; (3) costs of court; (4) judgment in an amount in

excess of Fifty-Thousand Dollars ($50,000.00); and (4) such other and further relief, general and special, to which Plaintiffs may show themselves justly entitled at law or in equity.

Respectfully submitted, this 18th  day of April 2022.

By:     /s/ Patrick King
**Patrick King** (IL Bar #6300213)
**MillerKing LLC**
2410 State St.
Alton, IL 62002
Telephone No.: 618.462.8405
Facsimile No.: 618.433.9918
Email: patrick@millerkinglaw.com

By:     /s/ Benjamin O'Connor
**Benjamin O'Connor** (IL Bar # 6321224)
**Robert C. Hilliard** (*pro hac vice to be filed*)
**Michael E. Richardson** (*pro hac vice to be filed*)
**HILLIARD MARTINEZ GONZALES LLP**
719719 S. Shoreline Boulevard
Corpus Christi, Texas 78401
Telephone No.: 361.882.1612
Facsimile No.361.882.3015
Email:  boconnor@hmglawfirm.com
Email:  bobh@hmglawfirm.com
Email:  mrichardson@hmglawfirm.com
Email:  hmgservice@hmglawfirm.com
(*Email for service of pleadings*)

*Attorneys for Plaintiffs*

PLAINTIFFS' ORIGINAL COMPLAINT

**PLEASE SERVE:**
**AMAZON.COM, INC.**
*Through its agent for service of process:*
Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

**AMAZON LOGISTICS, INC**.
*Through its agent for service of process:*
Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

**CONTEGRA CONSTRUCTION COMPANY, L.L.C.**
*Through its agent for service of process:*
Ronald Eric Gowin
22 Gateway Commerce Cnt W #110
Edwardsville, IL 62025

**TRISTAR PROPERTIES, LLC**
*Through its agent for service of process:*
Mehul Shah
318 South Walnut
Cameron, MO 64429

**STOCK & ASSOCIATES CONSULTING ENGINEERS, INC**.
*Through its agent for service of process:*
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

**GRAY DESIGN GROUP, INC**.
*Through its agent for service of process:*
CT Corporation
120 South Central Ave., Suite 400
Clayton, MO 63105

**MCNEALY ENGINEERING, INC.**
*Through its agent for service of process:*
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604



***EFILED***
Case Number 2022LA000510
Date: 4/19/2022 1:10 PM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

# EXHIBIT A

2022LA000510

NOT AN OFFICIAL COPY





3506 Narrative
Amazon Warehouse Collapse
Edwardsville IL
December 10,2021
West Co. Call# 21-3506237
CCE911 Call# 12102021-0000005

On December 10, 2021, I was contacted by West County EMS & Fire Battalion Chief Bob Kartje around 1500 hrs requesting my availability to roster as the professional engineer/Structures Specialist for possible deployment with St. Louis Regional UASI Strike Team 3 (STL County).  BC Kartje advised that the National Weather Service (NWS) was calling for a strong possibility of a tornado outbreak in the region.  I advised I would be available.

Around 2000 hrs, the storms were in and around our District.  After ensuring my home and family were out of harms way, I reported to my office at West County Station 2 to monitor the situation and be available to assist with any calls in the area.  At approximately 2117 hrs, Central County 911 (CCE911) sent out a page and set off tones dispatching a number of units to assemble at West County Station 2 for deployment.  Looking at the call notes, I learned that we were being sent to 3050 Gateway Commerce Center Dr S in Edwardsville IL for a Commercial Building Collapse.  The call notes listed it as an Amazon Building collapse.

Crews assembled at West County Station 2 and we briefed on available information before deploying in a convoy to the scene.  At the briefing and enroute, I was watching live video from the scene from Fox2 News and noted that it appeared to be a large commercial tilt-up warehouse that had collapsed on at least two sides.   Additional information from CCE911 just prior to 2200 hrs indicated 350 feet of wall was down and possibly 15-20 persons unaccounted for.

Upon our arrival at the scene, our team staged its vehicles and resources on the west side of the collapsed structure.  I immediately noticed that the north half of the building appeared to be standing intact, but that the south half of the building had collapsed walls on the west side, east side and some on the south side.  The west walls were clearly collapsed inward and I could not see from my initial vantage point which direction the other walls had failed.  I also noted that there were several dozen columns standing in the middle of the collapse and some roof trusses and roof girders still suspended, but what appeared to be a majority of the columns and roof trusses and girders had failed or were missing from view.



WEST COUNTY
FIRE
ESTABLISHED
1908
RESCUE
EMS & FIRE

While crews were assembling equipment and taking assignments from incident commanders on scene, I was requested to enter the structure and perform a structural assessment of the damage area.  Allen Smith, a fellow professional engineer/Structures Specialist from St. Louis UASI Strike Team 4 (STL Metro East IL) was already present on scene and came over to coordinate with me and incident commanders.   I was advised that there were a number persons missing and that the areas of concern for trapped persons were the west side of the building and the southeast corner of the building based on eyewitness statements of survivors.  Allen and I were sent with a representative of the Incident Command Team (ICT) to the interior of the building to conduct an assessment.

We entered the structure on the west side, just north of an area where a tow truck was being used to lift a wall panel section from an area of interest.  Based on the stenciled letter/number grid system on the columns, this area was believed to be between rows 13 to 14.  It should be noted that columns increased in letter from west to east and the rows increased in number from north to south.   Upon entering the floor of the building, my attention was drawn to the remaining trusses and columns that were still standing or suspended.  I noticed that many of the remaining trusses were not properly oriented on the columns, such that the lower chord of the truss (consisting of opposed angle steel with a center gap) were no longer straddling the knife plate or flat piece of steel that was welded to each side of the column. The knife plate keeps the truss from rotating around the upper connection of the truss to the column.  Given the increasing winds after the storm, I noted this as an area of concern to discuss with the ICT.  After continuing to evaluate the damage, I noted that a considerable number of the columns that a were not standing appeared to have been lifted out of the floor.  Allen Smith noticed the same thing and described it accurately as a peg coming out of a hole.  Other columns that were failed were partially raised out of the floor and laid over. All columns were mostly white in color with a yellow band several feet tall at the base of the column near the floor.  In each case of the failed columns, there was a clear line of demarcation on the bottom of the column just below the yellow band that showed an area of unpainted column with light brown surface oxidation that had been the area of the column that sat below the finished grade of the concrete floor.  I became concerned when I noticed that none of the columns appeared to be ripped or torn from the base.  This was especially concerning to me knowing that the International Building Code (IBC) requires structural members to be secured against uplift from wind loads, among other things.  (2021 IBC Section 1604.8.1)  Looking at the base of the columns more closely, I could find no weld or bolted connection at the base of any column, but only a bead of what appeared to be some sort of caulk around the column at the finished floor line.  An examination of several of the empty pockets were columns once stood also did not reveal any indication of positive securement of the columns at or below the finished floor level.   Allen and I discussed the matter while continuing to evaluate the area and remained concerned that while the ruins of the building posed various



dangers, we were very concerned about the stability of the remaining walls and suspended steel work.

During our evaluation, we noted that the west walls had failed inward to the east and the eastern walls had failed outward, also to the east.  There were 7 or 8 sections of wall on the south side of the structure that had failed inward to the north and several more that were leaning significantly inward but the panels composing the immediate southeast corner remained suspended.  While evaluating the ruins, we noted that there were dozens and dozens of Amazon delivery vans inside of the building and under the collapsed roof and wall sections.  The vans that were in the collapse zone of the walls had been flattened to only 1 to 2 feet tall at most.

We returned to the west side of the structure to advise the ICT of our assessment and requested any available building plans to be able to accurately identify areas of the building in correlation with the grid identification system sprayed on the columns.  As the scene progressed, Allen and I made continual assessments of various parts of the building to advise of concerns for further collapse or recommended methods of debris removal to most readily effect search and rescue in areas of identified concern.

At some point around 0130hrs on December 11, 2021, Allen and I split up to work in two separate rescue operations.  I redeployed to an area of identified concern on the southeast corner of the building with crews from Strike Team 3 near column H20 and extending to the southeast corner. The use of cadaver dogs had indicated the possibility of human remains in that area.  While we were there, two separate dogs were brought in and both hit on two separate areas of the collapse along the south wall.   Using search and rescue equipment, crews were able to identify the presence of an unknown number of Amazon delivery vans, perhaps 5 to 10, below the collapsed walls in that area.  I made a recommendation that the safest way to make access to the areas the dogs identified was to use available heavy equipment from a contractor on scene named Kamadulski to remove the failed wall sections starting from the west end of the collapsed south wall sections at H20 and work towards the wall sections where the dogs were hitting towards I20 and J20.   After discussion with the leaders of the rescue effort at our location, it was agreed to use my recommendation. I spoke with the older gentleman that was operating the large Kamadulski trackhoe and advised how I wanted to remove the wall sections.  He stated he was familiar with the construction of the building as he helped build it.  Once we were had confirmed the plan, the trackhoe operator called in a second trackhoe from his company and they began to work that area.

Around 0315 hrs, Strike Team 3 leader Mike Digman from Metro West Fire Prot. Dist. notified me that or team was being demobilized as the operation was transitioning from rescue to recovery. I advised the trackhoe operator that we were demobilizing and that any further direction would

NOT AN OFFICIAL COPY



come from someone besides me.  I returned to the west side of the building, made contact with Allen Smith to advise him that I was demobilizing, put away my gear and demobilized with the rest of Strike Team 3, leaving the scene at approximately 0341hrs.

On Monday December 13, 2021, I visited several tilt-up buildings in our District and reviewed their building plans on file to determine how their interior columns were secured against uplift. I was not able to find any that used a column in a sleeve.  I searched online and found that Edwardsville was still using the 2006 Edition of the International Building Code.  Researching the 2006 Code, I found that the 2006 edition had the same requirement in Section 1604 as the 2021 Code for anchorage of columns against uplift.  On Tuesday December 14, 2021, I advised my Chief, Jeff Sadtler, that I had found what I believed to be one or more significant structural issues with the Amazon building that may have contributed to the failure of the structure.  Chief Sadtler advised me that he had contacted OSHA and that an investigator named Chris Blair at 618-900-6789 would like to chat with me.

I contacted Chris Blair with OSHA and advised him of my findings and concerns.  Mr. Blair listened to me and requested copies of all of my photos.  Mr. Blair stated that what I was telling him was consistent with information he had from other sources, but that I was providing him more detail and photographic evidence.

On Friday December 17, Chief Sadtler advised me that the Chief of the Edwardsville Fire Department would like to speak with me concerning what I had found.   I called their chief and he and I discussed what was found.  He requested a copy of the photos I had.  I provided the photos to Chief Sadtler who then I believe used Dropbox to transmit the information to Edwardsville Fire.

It should be noted that on this call and in this matter, I was acting in the capacity of a FEMA-trained STS-1 Structures Specialist with an engineering background on an emergent call as part of a mutual-aid fire service rescue task force and not practicing professional engineering services for-hire.  Any statements made in this narrative concerning the design of the structure are advisory only and will require further analysis by other professionals before any conclusions could be reached.  Any photographs taken would need to be fully evaluated along with the debris as part of a failure analysis to formally determine compliance with any and all adopted codes by the Authorities Having Jurisdiction at the location of that structure.

P.E.

Dan Bruno, P.E., PTOE



Fire Marshal
West County EMS & Fire Protection District

**IN THE CIRCUIT COURT**
**FOR THE THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

| | | |
|---|---|---|
| **JAMARCO HICKMAN,** and | ) | |
| **EVAN JENSEN,** and | ) | |
| **JADA WILLIAMS,** and | ) | |
| **DEONTAE YANCEY** | ) | Case No. |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **AMAZON.COM, INC**., a corporation, and | ) | |
| **AMAZON LOGISTICS, INC.**, a corporation | ) | |
| **CONTEGRA CONSTRUCTION COMPANY,** | ) | |
| LLC, a limited liability company, | ) | |
| **TRISTAR PROPERTIES, LLC,** a limited | ) | |
| liability company | ) | |
| **STOCK & ASSOCIATES CONSULTING** | ) | |
| **ENGINEERS, INC**., a corporation, | ) | |
| **GRAY DESIGN GROUP, INC.,** | ) | |
| a corporation, and | ) | |
| **MCNEALY ENGINEERING, INC**., | ) | |
| a corporation. | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**AFFIDAVIT OF DAMAGES**</u>

**STATE OF ILLINOIS** )
 )
**COUNTY OF MADISON** )

    This Affidavit is hereto made pursuant to *Supreme Court Rule 222(b)*. Under the Penalties

of Perjury as provided by Section 1-109 of the Code of Civil Procedure, the undersigned hereby

certifies that the total of money damages sought by Plaintiff does exceed $<u>50,000.00</u>.



By: */s/ Patrick King*
Patrick King (IL Bar #6300213)
MILLERKING LLC
2410 State St.
Alton, IL 62002
Telephone No.: 618.462.8405
Facsimile No.: 618.433.9918
Email: patrick@millerkinglaw.com

By:
Benjamin O'Connor (IL Bar # 6321224)
Hilliard Martinez Gonzales LLP
719 S. Shoreline Boulevard
Corpus Christi, Texas 78401
Telephone No.: 361.882.1612
Facsimile No.: 361.882.3015
Email: boconnor@hmglawfirm.com

*Attorneys for Plaintiffs*


**SUBSCRIBED and SWORN TO before me this _____ day of _____ 2022.**


_____
**NOTARY PUBLIC**